UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DONALD L. CARUTH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:12-CV-351-B |
| | § | |
| TEXAS A&M UNIVERSITY-COMMERCE | § | |
| and DAN R. JONES, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a Motion for Summary Judgment (doc. 11), filed on December 7, 2012

by Defendants Texas A&M University-Commerce and Dan. R. Jones. For the reasons that follow,

the Court **GRANTS** Defendants' Motion.

## I.

## BACKGROUND

Plaintiff Dr. Donald L. Caruth is a former employee of Defendants Texas A&M University-

Commerce ("TAMU-Commerce") and President of TAMU-Commerce, Dr. Dan R. Jones. Doc. 11,

Mot. at 1; doc. 19, Resp. at 1. Plaintiff is suing Defendants for age and disability discrimination and

retaliation after he was denied tenure.

Plaintiff worked at TAMU-Commerce or its predecessor university off and on from 1974 to

1982. Doc. 11, Mot. at 1. He was hired as a tenure-track professor in 1982 and received tenure in

1986. *Id.* Plaintiff held tenure until 1997, at which point he relinquished it to return to the private

sector. *Id.*; doc. 19, Resp. at 1. In May of 2005, he again returned to TAMU-Commerce as a tenure-

- 1 -

track professor. Doc. 11, Mot. at 2; doc. 19, Resp. at 1. Plaintiff taught as a Professor of Management in TAMU-Commerce's Department of Marketing and Management (the "Department") in the College of Business and Technology (the "College"). Doc. 19, Resp. at 1.

All tenure-track professors at TAMU-Commerce were subject to a six-year probationary period, after which they could apply for tenure. At the close of each probationary year, the faculty member would receive an annual review and a decision as to whether he would continue at the university on the tenure-track. Doc. 11, Mot. at 3. Applicants for tenure were evaluated based upon their performance at three levels: teaching, research, and service. *Id.*; doc. 13, App. at 5-32. According to the College's published Guidelines for Academic Promotion and Tenure, "research" involved the faculty member's ability to develop a research stream that was peer-reviewed and available for public consumption. Doc. 13, App. at 12-13. Specifically, the Guidelines for Academic Promotion and Tenure stated:

> A candidate for tenure should have a minimum of six published, peer reviewed printed works during the probationary period to be considered for tenure. These may include peer reviewed journal articles (both print and electronic), published software, textbooks, practitioner books, chapters in textbooks and edited books. Funded research, which generally leads to peer reviewed publication, may be substituted at the rate of $100,000.00 for each journal article. The tenure candidate is strongly encouraged to exceed the minimum number of articles/funded research.
> Additional evidence of research and scholarship includes paper presentations and peer-reviewed proceedings. These additional materials will not offset the requirements of the [preceding] paragraph.

*Id.* at 13. The Guidelines further include a section on criteria for research and scholarship, which explain in detail the ways in which a "candidate for tenure or promotion must demonstrate proficiency in conducting research as evaluated by peers." *Id.* at 18-19. From 2005-2008, faculty members were expected to devote 30% of their time to research, with that amount increasing to 40%

in 2009. Doc. 19, Resp. at 6 (citing doc. 18-5, App. at 462-65).

Following each annual evaluation, a faculty member would receive a copy of a letter from the Dean of the College, Dr. Harold P. Langford, to the Provost or Interim Provost of TAMU-Commerce, containing a recommendation as to whether the faculty member should continue on the tenure track. In turn, the Provost would submit a letter directly to the faculty member advising him of the same. The faculty member could also receive a letter from the President of TAMU-Commerce acknowledging reappointment during the probationary period, if reappointment was offered.

In November 2006, Plaintiff received his first-year evaluation. Plaintiff did not publish any peer-reviewed articles during his first year. The letter from Dean Langford to the Provost, which was also sent to Plaintiff, recommended that Plaintiff continue on the tenure-track for his second year, but warned that his research should "expand to include peer reviewed publications in his portfolio." Doc. 13, App. at 34. The Interim Provost's letter to Plaintiff similarly recommended Plaintiff's reappointment but warned Plaintiff that "concerns were expressed regarding your scholarly research productivity. If you are to continue in a tenure-track position, you must meet with your department to develop an action plan that delineates specific goals and performance measures." *Id.* at 35. Plaintiff also received advisory opinions from tenured peers in his department, which indicated that Plaintiff's scholarly activity was lacking, if not a "major area of concern." *Id.* at 36-39.

In March 2007, Plaintiff received his second-year evaluation and was recommended for reappointment. *Id.* at 40. However, Plaintiff still had not published any peer-reviewed articles. He was nonetheless again warned in writing by Langford that he "needs to build his research productivity and will be required to submit a plan to the [College]." *Id.* at 40. The Interim Provost also wrote to Plaintiff in May 2007, emphasizing that "**[i]t is very important that you build research productivity**

**and submit a plan to the department head**." *Id.* at 41 (emphasis in original).

In April 2008, Plaintiff was reappointed to tenure-track probationary status for a third year. Langford's letter stated that the College recommended that Plaintiff "needs to build his research productivity" but acknowledged that he was "working on both journal articles and a new edition of his book." *Id.* at 43.

In 2008, Plaintiff published his first peer-reviewed article since returning as a professor in 2005. That same year, Plaintiff was diagnosed with colon cancer. Doc. 19, Resp. at 2. He underwent cancer treatment that impacted his vision, resulting in ocular disease, low vision, and neuropathy. *Id.* Plaintiff continued to work at TAMU-Commerce during his 2008 to 2009 treatment period. *Id.*

On March 30, 2009, Plaintiff finally told his Department that he had cancer, that he had undergone treatment, and that his cancer treatment caused side-effects which hindered his eyesight and, therefore, his ability to work on the computer and teach online courses. Doc. 19, Resp. at 8. Plaintiff was granted an accommodation to teach only face-to-face classes for the remainder of the 2009 school year and to limit his computer use. *Id.* In 2009, Plaintiff published his second peer-reviewed article and published a revised edition of a book that he co-authored. In May 2009 and June 2010, Plaintiff received his yearly evaluations which reappointed Plaintiff to the tenure track with no notes of concern. *Id.*

In December 2010, near the end of Plaintiff's six-year tenure probationary status, Langford had a discussion with President Jones regarding Plaintiff's chances of obtaining tenure. Langford expressed concern that Plaintiff's research trail was sub-par and that he would be denied tenure. Doc. 13, App. at 53, 56. Langford also feared that a denial of tenure would lead Plaintiff to file a lawsuit. *Id.* Langford asked Jones for permission to propose an alternative employment arrangement to

Plaintiff, and Jones approved. *Id.* at 56. Langford approached Plaintiff with the option of receiving a two-year non-tenured teaching position instead of applying for tenure. *Id.* at 56-57. Plaintiff declined the offer and submitted his tenure portfolio. *Id.* at 57.

During the relevant time period at TAMU-Commerce, a tenure portfolio was first reviewed for recommendation by the applicant's college, was then considered by the Dean's Council for recommendation, and was ultimately presented to TAMU-Commerce President Jones for an ultimate decision. Doc. 19, Resp. at 13-16. Plaintiff's tenure portfolio included two peer-reviewed articles and a revised book edition, which were the only works ultimately deemed by Defendants to count towards the minimum of six peer-reviewed publications. Doc. 13, App. at 1. Despite the fact that Plaintiff had not met the minimum publications requirements, two of the three members of the College's Tenure and Promotion Review Committee recommended granting tenure to Plaintiff, with the third abstaining for unknown reasons. Doc. 19, Resp. at 13. The Committee's recommendation was sent to Langford, who recommended to the TAMU-Commerce Provost, Dr. Larry Lemanski, that Plaintiff be granted tenure. Doc. 18-5, App. at 457. Lemanski submitted Langford's recommendation to the Dean's Council. Doc. 19, Resp. at 14. The Dean's Council held a meeting, attended by Langford, to discuss Plaintiff's portfolio. At the meeting, Langford alluded to Plaintiff's vision disability and noted Plaintiff's substandard publishing.[1] *Id.* Nonetheless, the Dean's Council, including Langford, continued to unanimously recommend that Plaintiff receive tenure. *Id.* Lemanski

---

[1]In his Response, Plaintiff contends that his accommodation and vision disability were "much-debated." Doc. 19, Resp. at 27 (citing doc. 18-4, App. at 309-10). Based on the summary judgment evidence cited by Plaintiff himself, however, this contention is a complete misrepresentation of the evidence. Plaintiff's summary judgment evidence, in the form of Lemanski's deposition testimony, shows that, at the Dean's Council meeting, Langford "just alluded to a vision problem, and that was about it" when Langford entered the room, prior to the tenure application discussion. Doc. 18-4, App. at 309-10.

took the Dean's Council vote to Jones for the final decision. Although Lemanski did not have a vote on the Dean's Council, he informed Jones that he too recommended granting tenure to Plaintiff. *Id.* at 14-15; doc. 18-4, App. at 313.

Jones then met with Lemanski to discuss the qualifications of all of the TAMU-Commerce tenure applicants. Doc. 18-4, App. at 312. At that meeting, Jones recommended that Lemanski reconsider the decision to recommend Plaintiff, because TAMU-Commerce needed to be consistent in applying the criteria in scholarship. *Id.* at 313. Lemanski mentioned to Jones that Langford related fears of a lawsuit if tenure was denied, but Jones said that a lawsuit was "not relevant" to tenure decisions and directed Lemanski to the credentials. *Id.* at 315-16.

After the meeting between Lemanski and Jones, the two scheduled a follow-up meeting with Langford. *Id.* at 317. At the meeting, there was a discussion that Plaintiff's publishing did not meet expectations. *Id.* at 322. Jones asked Lemanski and Langford if Plaintiff's application actually merited tenure under the criteria established by the College; Lemanski believed Plaintiff had not, while Langford was equivocal. Doc. 18-2, App. at 147-48. Langford shared his concerns that TAMU-Commerce would be sued. *Id.* at 148. Lemanski ultimately decided to reverse his recommendation of tenure. Doc. 18-4, App. at 332; doc. 18-5, App. at 459. Langford did not make a similar formal change in position. Jones decided at that meeting to deny Plaintiff tenure. In 2011, Jones formally denied Plaintiff's tenure application. Doc. 19, Resp. at 2; doc. 18-5, App. at 480; doc. 13, App. at 54.

In April 2011, following the denial of tenure, Plaintiff filed charges of discrimination and retaliation with state and federal agencies. Doc. 19, Resp. at 18. The parties have not explained whether the agencies made any determinations as to Plaintiff's charges. Plaintiff eventually filed an

Original Petition in state court alleging the following causes of action: disability discrimination by TAMU-Commerce, in violation of the Texas Commission on Human Rights Act ("TCHRA"), Texas Labor Code § 21.051, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112; age discrimination by Defendant TAMU-Commerce, in violation of the TCHRA, Tex. Lab. Code § 21.051, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1); retaliation by Defendant TAMU-Commerce, in violation of the TCHRA, Tex. Lab. Code § 21.051, and the ADA, 42 U.S.C. § 12203; and discrimination and retaliation by Defendant Jones, in violation of the ADA and ADEA. Doc. 1-5, Orig. Pet. Plaintiff seeks actual damages, compensatory damages (including lost wages and back pay), punitive damages, liquidated damages, equitable and injunctive relief, pre- and post-judgment interest, attorney's fees and costs. *Id.* at 16.

Defendants removed the case to federal court on February 2, 2012. Doc. 1, Notice of Removal. On December 7, 2012, Defendants filed a Motion for Summary Judgment (doc. 11). The Motion has been fully briefed and is ripe for review. This Court has original jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

## II.

## LEGAL STANDARDS

The purpose of summary judgment is "to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990). Accordingly, Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. SmithKline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Rather, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case. *Id.* When the movant bears the burden of proving an affirmative defense at trial, "it must establish beyond dispute all of the defense's essential elements." *Bank of La. v. Aetna U.S. Healthcare, Inc.*, 468 F.3d 237, 241 (5th Cir. 2006) (citing *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

Once the summary judgment movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam). Factual controversies regarding the existence of a genuine issue for trial must be resolved in favor of the non-movant. *Id.* Nevertheless, a non-movant may not simply rely on the Court to sift through the record to find a fact issue, but must instead point to specific evidence in the record and articulate precisely how that evidence supports the challenged claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Moreover, the evidence the non-movant does provide must raise more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). This evidence must be such that a jury could reasonably base a verdict in the

non-movant's favor. *Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1075.

## III.

## ANALYSIS

Defendants move for summary judgment on Plaintiff's age and disability discrimination claims and retaliation claims. Plaintiff has responded to the Motion and moves for leave to amend its pleadings with respect to its retaliation claims. The Court addresses each issue, in turn, below.

A.    *Discrimination*

1.    Direct v. Indirect Evidence

Plaintiff asserts he has direct evidence of disability discrimination.[2] Defendants respond that all claims in this case involve circumstantial evidence only. The distinction between direct and indirect evidence is relevant only in that direct evidence of discrimination is sufficient to establish a prima facie case, while indirect evidence involving inferences of discrimination is subject to the burden-shifting framework of *McDonnell Douglas*. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047-48 (5th Cir. 1996). "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (*i.e.*, unlawful discrimination) *without any inferences or presumptions*." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir. 1996) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir. 1993)). Plaintiff alleges that he has direct evidence of disability discrimination in the form of two sets of statements made by Langford about Plaintiff's disability. Doc. 19, Resp. at 24. In one set of

_____

[2]Plaintiff admits that his age discrimination claims are based upon indirect evidence only. Doc. 19, Resp. at 24 n.35.

statements, Langford allegedly told others that Plaintiff's accommodation of teaching only face-to-face courses was causing the College hardship since it needed professors to teach online courses. Specifically, according to TAMU-Commerce Assistant Professor Dr. Jennifer D. Oyler's affidavit, Langford mentioned the need for more professors to teach online classes, but when Oyler said the College could assign Plaintiff more face-to-face classes, Langford responded "That's where it's hurting us." Doc. 18-6, App. at 528. In another conversation with Oyler, Langford stated "I don't know what I'm going to do with Don. . . . We've made numerous accommodations and he's insistent on going for tenure, but I don't think we're going to be able to give it to him." *Id.* at 526. Langford further explained that the Department "need[ed] someone to teach online classes but Don can't teach online." *Id.* Plaintiff also produces his Declaration showing that Langford told Plaintiff that his vision disability and accommodation of teaching only face-to-face classes was causing a problem in that it was difficult to schedule courses and he needed someone more flexible. Doc. 18-5, App. at 449. Langford's statement was made in the context of him explaining to Plaintiff why Langford felt that Plaintiff would not receive tenure if he applied for it. *Id.*

In the second set of statements, Langford stated that he wanted to avoid an inevitable lawsuit that would be brought if tenure was denied.[3] Doc. 19, Resp. at 27. In his affidavit, he admits that he supported Plaintiff's tenure application in part because he "believed it would be best to avoid a lawsuit." Doc. 13, App. at 57. Additional summary judgment evidence shows that Langford shared his concern with others. Doc. 18-6, App. at 526; doc. 18-4, App. at 309-10, 314-17, 335.

---

[3]There is a factual dispute as to whether Langford's comment about a lawsuit was made before or after Plaintiff threatened to file a lawsuit. The Court concludes that the dispute is immaterial to deciding whether Langford's comments, taken in the light most favorable to Plaintiff, constitute direct evidence of retaliation.

Plaintiff argues that his summary judgment evidence of Langford's comments constitutes direct evidence of discrimination. Plaintiff points out that remarks may be sufficient to prove discrimination if the offered comments are: 1) related to the discriminated characteristic; 2) proximate in time to adverse action; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue. *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996); *Reed v. Neopost U.S., Inc.*, 701 F.3d 434, 441 (5th Cir. 2012).

The summary judgment evidence viewed in the light most favorable to Plaintiff shows that although Langford's comments involved Plaintiff's vision disability, were raised during tenure discussions, and were related to his tenure, Langford did not have authority to decide Plaintiff's tenure application. Indeed, Plaintiff admits that Langford did not and could not make the ultimate decision to grant or deny Plaintiff's tenure application. Doc. 19, Resp. at 25. Plaintiff instead advances a "cat's paw" theory, asserting that Langford persuaded Jones to deny tenure or persuaded Lemanski to persuade Jones to deny tenure, despite the fact that Langford publicly and officially recommended Plaintiff for tenure. "In employment discrimination law the 'cat's paw' metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012).

Assuming that the cat's paw theory is still valid for discrimination claims in the Fifth Circuit, *see Holliday v. Commonwealth Brands, Inc.*, 483 F. App'x 917, 922 (5th Cir. 2012), Plaintiff's only summary judgment evidence in support is an affidavit from Oyler stating that "Langford, while Dean, wielded significant influence over all aspects of the College of Business and also many aspects of

campus life and beyond." Doc. 18-6, App. at 527. This evidence is insufficient to raise a fact dispute with Defendants' summary judgment evidence that Jones alone made the ultimate decision to deny Plaintiff tenure. Doc. 13, App. at 54. Plaintiff has merely *argued* that Langford's comments actually influenced Jones to deny Plaintiff's tenure application, a leap which is unsupported by the summary judgment evidence and, in any event, requires multiple inferences. *See Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999) (explaining that prejudicial comments made by an individual who "did not participate in the ultimate decision to deny . . . tenure" are merely stray remarks that can constitute only indirect evidence). Because the Court must engage in making inferences to support Plaintiff's theory, the evidence is not direct evidence, and the Court must turn to the *McDonnell Douglas* framework.

Plaintiff's claims of discrimination based on age and disability, in violation of the ADA, ADEA, and TCHRA are indirect evidence claims and are therefore subject to the *McDonnell Douglas* burden-shifting analysis. *See Dees v. United Rentals N. Am., Inc.*, No. 12-30477, 2013 U.S. App. LEXIS 40, at *4 (5th Cir. Jan. 2, 2013) (ADEA); *Reed*, 701 F.3d at 439 (TCHRA); *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009) (ADA). Under *McDonnell Douglas*, a plaintiff must initially present evidence of a prima facie case of discrimination. *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 881 (5th Cir. 2003); *Stewart v. Sanmina Tex., L.P.*, 156 S.W.3d 198, 208 (Tex. App.—Dallas 2005, no pet.). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Manning*, 332 F.3d at 881; *Stewart*, 156 S.W.3d at 208. The defendant's burden, however, is only one of "production, not persuasion, and involves no credibility assessment." *Jinks v. Advanced Prot. Sys., Inc.*, 162 F. Supp. 2d 542, 546 (N.D. Tex. 2001). If the defendant meets its burden, then, under the ADA, "the burden shifts back to the

plaintiff to establish that the defendant's reason either is a pretext for discrimination or is only one of the reasons for its conduct and another motivating factor is the plaintiff's protected characteristic." *Adeleke v. Dall. Area Rapid Transit*, 487 F. App'x 901, 903 (5th Cir. 2012). The TCHRA follows the same standard as the ADA. *Reed*, 701 F.3d at 439. The Fifth Circuit has recently explained that the burden of demonstrating pretext in ADEA claims is different than that under the ADA and TCHRA:

> Importantly, the TCHRA and the ADEA involve a different causation inquiry at the third stage of the *McDonnell Douglas* analysis. Under the ADEA, a plaintiff must prove that age was the "but for" cause of the challenged adverse employment action. Under the TCHRA, however, a plaintiff need only show that age was a "motivating factor" in the defendant's decision.

*Id.* at 440 (internal citations omitted).

2.    Prima Facie Case

A plaintiff who alleges discrimination on the basis of a disability establishes a prima facie case under the ADA by showing that "1) he has a disability; 2) he is qualified for the job; and 3) an adverse employment decision was made . . . because of his disability." *Tyler v. La-Z-Boy Corp.*, No. 12-60327, 2013 U.S. App. LEXIS 363, at *5-6 (5th Cir. Jan. 4, 2013) (internal quotation marks omitted); *Griffin v. UPS*, 661 F.3d 216, 222 (5th Cir. 2011). Similarly, a prima facie case of age discrimination under the ADEA requires proof that "(1) [the plaintiff] is within the protected class; (2) [he] is qualified for [his] position; (3) [he] suffered an adverse employment decision; and (4) [he] was treated less favorably than similarly situated younger employees (i.e., suffered from disparate treatment because of membership in the protected class)." *Bellard v. JPS Health Network*, 439 F. App'x 392, 395 n.1 (5th Cir. 2011) (citing *Smith v. City of Jackson, Miss.*, 351 F.3d 183, 196 (5th Cir. 2003)). The ADEA prima facie elements also apply to both age and disability discrimination claims

- 13 -

under the TCHRA. *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008).

Although the prima facie elements outlined above remain applicable to this case, the Fifth Circuit has clarified that, in reviewing employment discrimination claims, "tenure decisions in colleges and universities involve considerations that set them apart from other kinds of employment decisions." *Tanik v. S. Methodist Univ.*, 116 F.3d 775, 776 (5th Cir. 1997), *cert. denied*, 522 U.S. 1015 (1997); *Kumar v. Univ. of Mass.*, 774 F.2d 1, 11 (1st Cir. 1985); *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92 (2nd Cir. 1984). This is so because "tenure contracts require unusual commitments as to time and collegial relationships, academic tenure decisions are often non-competitive, tenure decisions are usually highly decentralized, the number of factors considered in tenure decisions is quite extensive, and tenure decisions are a source of unusually great disagreement." *Tanik*, 116 F.3d at 776 (numbering omitted). Accordingly, to establish discrimination following a denial of tenure, a "plaintiff must show that: (1) he belongs to a protected group, (2) he was qualified for tenure, and (3) he was denied tenure in circumstances permitting an inference of discrimination." *Id.* (race and national origin discrimination); *Krystek*, 164 F.3d at 257 (gender discrimination); *Lazarou v. Miss. State Univ.*, No. 1:07-CV-00060-GHD-DAS, 2013 U.S. Dist. LEXIS 21138, at *15-16 (N.D. Miss. Feb. 14, 2013) (race and national origin discrimination); *Underwood v. E. Tex. State Univ.*, No. 3:96-CV-2739-G, 1998 U.S. Dist. LEXIS 5813 (N.D. Tex. Apr. 15, 1998) (gender discrimination), *aff'd*, 182 F.3d 915 (1999); 1-8 Larson on Employment Discrimination § 8.08 (noting that the wording of the third factor should not be construed to lessen the plaintiff's burden of proving a prima facie case of discrimination). Types of evidence establishing a prima facie case of discrimination following a denial of tenure may include, for example, "departures from procedural regularity, conventional evidence of bias on the part of individuals involved, or that the plaintiff is found to be qualified for

tenure by some significant portion of the departmental faculty, referrants or other scholars in the particular field." *Tanik*, 116 F.3d at 776.

It appears that Defendants do not contest that Plaintiff is a member of a protected class, *i.e.*, individuals over forty years of age and disabled individuals, or that he suffered adverse employment actions in the form of (1) denial of tenure, (2) placement on a terminal contract, and (3) the refusal to renew his contract. *See* doc. 1-5, Original Pet. ¶ 44. Defendants also do not dispute that Plaintiff was replaced by a younger, non-disabled individual. Instead, Defendants allege that they are entitled to summary judgment on the state and federal age and disability discrimination claims because Plaintiff cannot show that he was qualified for tenure. Defendants argue that the undisputed summary judgment evidence shows that Plaintiff was not qualified due to his failure to meet the minimum peer-reviewed publications requirement of tenure applications. Doc. 12, Br. at 4-5. Defendants do not analyze Plaintiff's discrimination claims under the *Tanik* factors.

Plaintiff brings uncontroverted summary judgment evidence to show that Defendant is not entitled to summary judgment on its discrimination claims under *Tanik*. Plaintiff points to summary judgment evidence that there were alleged procedural irregularities in Plaintiff's tenure application, in that the notification of Plaintiff's deadline to apply for tenure was untimely, Langford directed the faculty to fill out their advisory opinions quickly , and Jones disregarded the recommendations of the two lower levels of tenure review in denying tenure, which was unusual. Doc. 19, Resp. at 34. Plaintiff next points to summary judgment evidence of Langford's allegedly discriminatory comments as well as statistical evidence of an age disparity in successful versus unsuccessful tenure candidates, in support of "conventional evidence of bias." *Id.* at 33. Finally, Plaintiff points to summary judgment evidence that, at every layer of review prior to Jones' decision, Plaintiff received unanimous

recommendations for tenure and, in the later years of his probationary period, received no criticism of his scholarship. *Id.* at 32.

While the reconciliation between the *Tanik* factors and the traditional prima facie elements is not entirely clear, courts applying *Tanik* have consistently held that the plaintiff must be qualified for tenure and should grant "substantial deference" to tenure decisions. *See, e.g.*, *Underwood*, 1998 U.S. Dist. LEXIS 5813, at *13 n.6 (citing *Travis v. Bd. of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 264 (5th Cir. 1997)). Nonetheless, because a plaintiff "need only make a low showing" to establish a prima facie case of discrimination, *see Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 754 (5th Cir. 2005), the Court will assume *without deciding* that Plaintiff can establish a prima facie case for age and disability discrimination by providing evidence under the *Tanik* factors. 116 F.3d at 776. The Court will therefore continue with the analysis under the *McDonnell Douglas* framework.

2.    Legitimate, Non-Discriminatory Reason

Defendants state that, despite Plaintiff's accusations, they had a legitimate, nondiscriminatory reason for denying tenure: Plaintiff did not publish a minimum of six peer-reviewed scholarly articles during his six years of probation, falling below the objective, minimum qualification requirement for tenure. *See Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 879 (8th Cir. 2005) ("We are mindful of the singular nature of academic decision-making, and we lack the expertise to evaluate tenure decisions or to pass on the merits of a candidate's scholarship."). Defendants submit the College's published Guidelines for Academic Promotion and Tenure as summary judgment evidence of the objective requirements for a faculty member seeking tenure. The Guidelines state that "[a] candidate for tenure should have a minimum of six published, peer reviewed printed works during the probationary period to be considered for tenure" but that "[t]he tenure candidate is strongly encouraged to exceed

the minimum number of articles." Doc. 13, App. at 13.

During Plaintiff's six years of probation, he published only two peer-reviewed articles and a revised edition of a book he previously published. Doc. 13, App. at 1 (Caruth CV). Plaintiff thus fell far below the "minimum" of publishing six qualifying works over six years. Plaintiff was warned early on that he needed to increase his peer-reviewed scholarship. *See* doc. 13, App. at 34 (2006 Langford Letter), 35 (2006 Interim Provost Letter), 37-39 (Faculty Opinions), 40 (2007 Langford Letter), 41 (2007 Interim Provost Letter), 43 (2008 Langford Letter). Defendant Jones, the ultimate decision maker on tenure, avers that his decision to deny Plaintiff's tenure application was due to this failure to meet the scholarship requirement. Doc. 13, App. at 54 (Jones Aff.). Defendants also explain that Plaintiff was placed on a terminal contract and not given a renewed contract because Plaintiff rejected a non-tenured teaching position when it was offered to him. *Id.* at 53 (Jones Aff.), 56 (Langford Aff.).

The Court concludes that Defendants have satisfied their burden of producing summary judgment evidence of a legitimate, nondiscriminatory reason for the decision to deny tenure and place Plaintiff on a terminal contract without renewal, *i.e.*, that Plaintiff failed to meet the minimum publication requirement for obtaining tenure and that Plaintiff rejected an offer to remain employed in a non-tenured teaching position. *See Krystek*, 164 F.3d at 257 (reversing jury verdict where "the evidence clearly indicates that [the plaintiff] failed to meet an established [university] tenure requirement: 'publishing scholarly work,'" when the plaintiff published only two articles); *Lazarou*, 2013 U.S. Dist. LEXIS 21138, at *24-28 (finding legitimate explanation for denial of tenure in that the plaintiff's small number of peer-reviewed articles (two) was substandard).

3.      Pretext

Under the third step in the *McDonnell Douglas* burden-shifting framework, Plaintiff must show that, despite Defendants' reasons supporting its actions, discrimination was a motivating factor for the adverse employment action under the ADA and TCHRA and that the discrimination was the but-for cause of the adverse employment action under the ADEA. *See Reed*, 701 F.3d at 439-40; *Adeleke*, 487 F. App'x at 903. Defendants move for judgment in that the summary judgment evidence does not demonstrate pretext. Plaintiff disagrees and points to evidence and argument disputing that Defendant is entitled to judgment.

Plaintiff first argues that the minimum publication requirement in the Guidelines for Academic Promotion and Tenure is not a true requirement or that Defendants disparately applied the research requirements. Plaintiff presents summary judgment evidence that two younger, nondisabled professors, Derek Harter (age 43) and Sandy Kimbrough (age 37), were criticized for poor scholarship but granted tenure at TAMU-Commerce. The Fifth Circuit has "explained consistently that for employees to be similarly situated[,] those employees' circumstances . . . must have been 'nearly identical.'" *Perez v. Tex. Dep't of Crim. Justice*, 395 F.3d 206, 213 (5th Cir. 2004) (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)). Plaintiff's evidence does not indicate that Harter and Kimbrough were similarly situated to him, because the record does not show that the professors failed to meet the minimum number of publications. The record shows only that their publications were not of the highest quality. *See Krystek*, 164 F.3d at 257-58 (dismissing disparate treatment argument where tenure applicants' published work was not comparable); *Lazarou*, 2013 U.S. Dist. LEXIS 21138, at *19-24 (comparing quality of research of two tenure applicants under disparate treatment argument).

Plaintiff further argues that the publications requirements were not genuine requirements because the Department head, Dr. Lloyd Basham, had never seen the Guidelines until his deposition. Doc. 19, Resp. at 36. Moreover, because each of the entities reviewing Plaintiff's tenure application supported his application, Plaintiff infers that none of those entities were concerned with his failure to meet the publication requirements. Even viewing the evidence in the light most favorable to Plaintiff, the fact that some faculty did not know of or disregarded the Guidelines does not alter the fact that the summary judgment evidence shows that Jones made the decision to deny tenure and that decision was based on the objective Guidelines requirement.

Plaintiff also alleges that he was never given a reason for his tenure denial despite a request to do so and that there was a "lack of criticism" of Plaintiff's scholarship, which Plaintiff characterizes as an "evolving" rationale for the denial of tenure. Doc. 19, Resp. at 32, 37. The undisputed summary judgment evidence shows that Plaintiff was criticized numerous times for his lack of scholarship by the Dean on November 3, 2006, March 14, 2007, and April 2, 2008 (doc. 13, App. at 34, 40, and 43); by the Interim Provost on November 28, 2006 and May 9, 2007 (*id.* at 35, 41); and by three colleagues in separate reviews during October 2006 (*id.* at 37-39). *See Lazarou*, 2013 U.S. Dist. LEXIS 21138, at *35-36 (denying pretext argument that Plaintiff was unaware of the deficits in his scholarship because Plaintiff had received criticism in his annual reviews). Furthermore, the failure to give any answer for tenure denial until litigation does not constitute the sort of suspect changing explanation for an actionable adverse employment action.

Plaintiff further points to Lemanski's and Langford's allegedly changing positions on whether they would recommend Plaintiff for tenure. The summary judgment evidence, when viewed in the light most favorable to Plaintiff, does not show that Langford ever changed his recommendation of

awarding Plaintiff tenure; instead, it shows that he recommended Plaintiff while also vocalizing qualms about granting tenure. The summary judgment evidence does show that Lemanski reversed his position, initially supporting Plaintiff's tenure application in a conversation with Jones and later officially recommending in writing that tenure be denied. However, as explained above, neither Lemanski nor Langford were the ultimate decision makers on the tenure application and there is no evidence that either of them exerted influence over Jones. If anything, the undisputed summary judgment evidence shows, and Plaintiff admits, that it was Jones who encouraged Lemanski to alter his position based on Plaintiff's credentials, and not the other way around. *See* doc. 19, Resp. at 14 ("Lemanski recommend Caruth for tenure before Langford and Jones dissuaded him."). Furthermore, "[w]here the tenure decision was following the chain of appeal, each decision along the way is not actionable. Only the final decision is the ultimate act." *Okruhlik*, 395 F.3d at 879 (citing *Howze v. Va. Polytechnic Inst. & State Univ.*, 901 F. Supp. 1091, 1097 (W.D. Va. 1995)).

Plaintiff has not pointed the Court to any summary judgment evidence that Defendants do not follow the Guidelines' publication requirements. Nor has Plaintiff presented summary judgment evidence to dispute Defendants' summary judgment evidence that Jones has never approved tenure for any individual who did not meet the minimum number of qualifying publications. Doc. 13, App. at 54-55.

Plaintiff also spends a significant amount of his briefing on comments allegedly made by Langford related to Plaintiff's disability and other faculty members' gender or age. For the reasons discussed above, those comments, however, are not indicative of whether Jones' decision involved discrimination. *See Brown*, 82 F.3d at 655 (actionable statements are those made by an individual with authority over the adverse employment action); *Lazarou*, 2013 U.S. Dist. LEXIS 21138, at *14

("The alleged comment also was not made by an individual with authority over the employment decision, as the department head was but one reviewer in the multi-tiered tenure review process and did not participate in the ultimate decision to deny Plaintiff tenure."). Langford's comments do not show that Jones' decision was motivated in part by age or discriminatory animus, let alone that discrimination was a "but-for" cause of the adverse employment action.

As evidence of Defendants' allegedly bad motives, Plaintiff next points to the fact that Defendants never offered to give Plaintiff an extra year of probation to bolster his credentials. Doc. 19, Resp. at 44. Plaintiff has not brought evidence to show that such an accommodation was ever requested or required, and this fact is insufficient to prove pretext.

Finally, in support of his age discrimination claim, Plaintiff submits as summary judgment evidence a chart prepared by his counsel that summarizes the ages of tenure candidates at TAMU-Commerce. Doc. 18-1, App. at 2-3 (Sanford Aff.), 28-29 (Table). From the data, counsel has concluded that, during Jones' tenure from Fall 2008 to Spring 2012, the average age of candidates applying for tenure was 48.36. *Id.* at 29. The average age of candidates who were denied tenure was 55.45, while the average age of candidates who were granted tenure was 46.59. *Id.* Defendant does not deny the accuracy of the statistics. Plaintiff contends that "[t]his age disparity is at least some evidence that age factored into Caruth's rejection." Doc. 19, Resp. at 34. The undisputed statistical evidence is certainly relevant to the issue of pretext, but falls far short of showing that "but-for" Plaintiff's age, he would have been granted tenure. *Reed*, 701 F.3d at 440; *see Zahorik*, 729 F.2d at 95 (concluding that statistical evidence of discriminatory treatment in tenure decisions is "meaningless absent a departmental breakdown" and that "[m]ore particularized evidence relating to the individual plaintiffs is necessary to show discriminatory treatment"). The Court also concludes

that this statistical evidence alone is also not enough to show that, under the TCHRA, age was a "motivating factor" in denying Plaintiff's tenure application, terminating his contract, and failing to renew his contract. *Id.*

In the end, Plaintiff simply has not raised a material factual dispute that Jones' decision to deny Plaintiff tenure was based only upon Plaintiff's failure to meet the objective, minimum publications required of every tenure applicant at TAMU-Commerce and that placement on a terminal, non-renewable contract was due to Plaintiff's rejection of such an offer. As the Fifth Circuit has explained: "Where, as here, an assistant professor has been treated equally and has been held to the same standards applied to every other tenure-track faculty member at the university, he may not seek refuge under [the law] simply because he is unable or unwilling to meet the minimum requirements for tenure." *Krystek*, 164 F.3d at 258 (emphasis omitted). The Court therefore **GRANTS** summary judgment to Defendants on each of Plaintiff's disability and age discrimination claims under the ADA, ADEA, and TCHRA.

B.    *Retaliation*

Plaintiff also brought a claim for retaliation, in violation of the TCHRA, Tex. Lab. Code § 21.051, and the ADA, 42 U.S.C. § 12203(a).[4] Plaintiff alleges that he has raised direct and indirect evidence of retaliation. However, he has not pointed the Court to any such direct evidence, so the Court will consider his retaliation claims to be based on circumstantial evidence only. Thus, the retaliation claims under the TCHRA and ADA must be analyzed under the *McDonnell Douglas*

---

[4]The ADA provision on retaliation provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a).

burden-shifting scheme. *Stewart*, 156 S.W.3d at 208 (TCHRA); *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998) (ADA).

"To establish a prima facie case of unlawful retaliation, [the plaintiff] must show that he was engaged in an activity protected by statute, that he was subject to an adverse employment action, and that there was a causal link between the protected act and the adverse action." *Hammond v. Jacobs Field Servs.*, No. 12-30222, 2012 U.S. App. LEXIS 24919, at *13 (5th Cir. Dec. 5, 2012) (ADA); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 650, 657 (5th Cir. 2012) (TCHRA). "Protected activities consist of (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing." *Dias v. Goodman Mfg. Co.*, 214 S.W.3d 672, 676 (Tex. App.–Houston [14th dist.] 2007, pet. denied). "An adverse employment action is any action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hammond*, 2012 U.S. App. LEXIS 24919, at *13 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) and *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007)); *Dooley v. Parks & Rec. for the Parish of E. Baton Rouge*, 433 F. App'x 321, 324 (5th Cir. 2011). "A 'causal link' is shown when the evidence demonstrates that the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Hammond*, 2012 U.S. App. LEXIS 24919, at *13 (citing *Sherrod*, 132 F.3d at 1122).

The Original Petition alleges that Plaintiff engaged in the protected activity of requesting reasonable accommodations for his disabilities in March 2009 and November 2010. Doc. 1-5, Original Pet. ¶ 52. Plaintiff then alleges that he suffered adverse action in that Defendants (1) denied his tenure application, (2) placed him on a terminal contract, and (3) refused to renew his contract

because of his protected activity. *Id.* ¶ 53. Third, Plaintiff alleges that the adverse actions were taken by Defendants because of Plaintiff's protected activity of requesting accommodations. *Id.* Defendants do not dispute that Plaintiff's alleged action of requesting accommodations was a protected activity or that Plaintiff suffered adverse employment action. *See* doc. 12, Br. at 9. Instead, Defendants argue that they are entitled to summary judgment due to Plaintiff's failure to establish the prima facie element of a causal link between the protected activity and the termination.

Defendants again argue that the undisputed summary judgment evidence, when viewed in the light most favorable to Plaintiff, shows that Plaintiff was not granted tenure and his contract was terminated without renewal because Plaintiff failed to meet the minimum qualifications for tenure and because Plaintiff himself refused a non-tenured teaching position. In his response briefing, Plaintiff does not distinguish between his discrimination and retaliation claims, instead combining the analysis of the two and raising the same arguments for both. As such, Plaintiff advances the same alleged disputes of material fact and summary judgment evidence. For the reasons discussed above, Plaintiff has not rebutted with summary judgment evidence or shown a dispute of fact that Defendants' legitimate, non discriminatory reasons were mere pretext for retaliation. The Court therefore **GRANTS** summary judgment to Defendants on Plaintiff's retaliation claims under the ADA and TCHRA.

C.      *Interference*

In his summary judgment briefing, Plaintiff observes that Defendants responded only to a claim of retaliation but not a claim of interference, which Plaintiff alleges was his intended claim. Plaintiff states "[t]o the extent that [interference] is not a form of retaliation," he requests "leave to amend his complaint to specify interference in place of retaliation." Doc. 19, Resp. at 3 n.3, 31 n.66.

Under Section 12203(b), a person is prohibited from coercing, intimidating, threatening, or interfering with another who is exercising a right protected under the ADA, such as seeking disability accommodations from an employer. 42 U.S.C. § 12203(b); *Miles-Hickman v. David Powers Homes, Inc.*, 613 F. Supp. 2d 872, 881 (S.D. Tex. 2009). It appears to the Court that Plaintiff's Complaint comprehended both a claim for retaliation under 42 U.S.C. § 12203(a) and interference under § 12203(b). The Original Petition did not specify the relevant subsection(s) of § 12203, but alleged that Defendants should be liable for "*retaliating* against Caruth for requesting reasonable accommodations, for asserting his rights, *and/or* for *interfering or intimidating* him from taking such actions." Doc. 1-5, Original Pet ¶ 54(b) (emphasis added).

Although Defendants do not explicitly address interference, they note their confusion regarding the basis for Plaintiff's retaliation claim. Regardless, the summary judgment record contains no evidence whatsoever that Defendants interfered or intimidated Plaintiff from requesting accommodations, as alleged in Plaintiff's pleadings. Indeed, Plaintiff's own summary judgment evidence shows that Defendants were not aware of Plaintiff's disabilities or the need for accommodations until after Plaintiff requested his accommodations and that Defendants immediately granted all of Plaintiff's requested accommodations. For the reasons discussed above, summary judgment is **GRANTED** to Defendants on Plaintiff's interference claim, to the extent that it is independent of Plaintiff's retaliation.

Plaintiff also requests leave of this Court to amend his pleadings to further specify the interference-based retaliation claim. Where, as here, leave to amend is sought after the deadline outlined in a court's scheduling order, the party seeking amendment must meet the standard set forth in Federal Rule of Civil Procedure 16(b), which instructs that a scheduling order "may be modified

only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4); *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008). "The good cause standard requires the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension." *S&W Enters., L.L.C. v. Southtrust Bank of Ala.*, 315 F.3d 533, 535 (5th Cir. 2003)(internal quotation marks omitted). Courts consider four factors in assessing good cause: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Fahim*, 551 F.3d at 348.

If the party seeking leave meets the good cause threshold under Rule 16(b), it must then satisfy the general standard for the amendment of pleadings pursuant to Federal Rule of Civil Procedure 15(a). Although Rule 15(a) provides that leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), leave to amend "is by no means automatic." *Little*, 952 F.2d at 845-46. Courts may deny amendment due to "bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment." *Goldstein v. MCI Worldcom*, 340 F.3d 238, 254 (5th Cir. 2003). Courts should also consider the factors of judicial economy and the most expeditious means to resolve the case on its merits. *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981). The final decision to grant or deny leave "lies within the sound discretion of the district court." *Little*, 952 F.2d at 846.

This case is in its final stages, past the discovery and dispositive motions deadlines and with trial set in a few weeks. It would be highly and unduly prejudicial to Defendants to permit such an amendment at this point in time, especially given that Plaintiff has not explained why he has waited

so long to seek amendment of his interference claim nor how he would amend the Complaint. The

Court therefore **DENIES** leave to amend under Rules 16 and 15.

## IV.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (doc. 11) is hereby

**GRANTED**.


SO ORDERED.

SIGNED: March 14, 2013.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE